## No. 6996.

### E. S. ESKRIDGE AND HUSBAND VS. E. D. FARRAR, AGENT; AND MARY E OGDEN ET AL. VS. THE HEIRS ET AL. OF JOHN PERKINS.

The executor may prosecute to its final termination, an action instituted by the testator to annul a donation *inter vivos* made by him.

When parties, who have been instituted by a last will as universal legatees, or legatees under a universal title, assume the quality of such legatees, they become bound for the debts of the succession, and—saving the case of reduction—for the payment of the particular legacies.

When the condition on which a donation was made has not been complied with, the donation may be revoked, whether the property donated be in the possession of the donee, or of a transferee of the donee.

When neither error nor fraud is alleged by parties, they can not be relieved from the legal effects of their own acts, and declarations.

Heirs and universal legatees are personally bound, in proportion to the share each inherits, to pay the particular legacies. But they are bound only to the extent of the effects of the succession, and hence they may free themselves from paying the legacies by abandoning to the legatees, after the payment of debts, the effects of the succession.

APPEAL from the Thirteenth Judicial District Court, parish of Madison. *Hough*, J.

*Thos. P. Farrar*, *J. R. Currell*, and *E. H. Farrar* for plaintiffs and appellees.

*J. W. Montgomery* and *T. J. Semmes* for defendants and appellants.

The opinion of the court was delivered by

· DEBLANC, J. John Perkins senior died in the State of Mississippi, on the 30th of November 1866, leaving as forced heirs: his son John and the children of his deceased son William. In December 1866, the last will of the said John Perkins senior was probated in Mississippi, its execution ordered in this State, and Abner N. Ogden and Josiah Stansbrough appointed as the executors of the same by the Judge of the 13th district of this State. By that will, the deceased instituted defendants his universal legatees, and charged his bequest to them with particular legacies in favor of plaintiffs, who now claim from said defend-

Eskridge vs. Farrar.

ants what they consider they are entitled to under the provisions of that probated and subsisting will.

Defendants appeared in Court through an agent, and—for answer to plaintiffs' demand—contend that the will of John Perkins senior is null and void, because it contains a prohibited substitution, and also because the particular legacies are largely in excess of the disposable portion.

They allege—besides—that, in April 1857, the deceased donated to his son John the Somerset estate, then valued at more than six hundred thousand dollars, and that one of the conditions of that donation was that his said son should—at the death of the donor—pay to them— the respondents—partly as a gift from him to them, and partly in satisfaction of their inheritance from their grandmother, the deceased wife of the said John Perkins senior, the sum of two hundred and forty thousand dollars. That, on the 11th of August 1869, in compliance with that condition, the donee of the Somerset estate sold them four of the plantations comprised in that estate, in payment of the aforesaid claim, which is specially referred to and re-asserted in the deceased's will.

In bar of plaintiffs' demand, respondents plead the prescription " of one and ten years, and prescription generally."

In the pleadings and in the arguments, two principal questions are presented:

1. Was the donation of April 1857, from John Perkins to his son, revoked either before or since the death of the donor?

2. Do defendants derive their title to the Somerset estate from that donation and the dation in payment from John Perkins to them, or from their ancestor's will?

If we could look beyond the evidence introduced by the parties, it would not be difficult to find that, in December 1865, John Perkins senior brought suit to revoke the donation made by him to his son in April 1857, that—by a decree of the 13th district court, rendered in November 1866, said donation was revoked—that said decree was reversed by this court in 1868, and the case remanded for the express purpose of allowing the creditors of John Perkins junior to intervene in that suit;. and—here—returning to the Record, what do we find? That—in his last will, which bears the date of the 11th of June 1866, John Perkins senior declares that the Somerset estate had reverted to him and that he had sued to recover the same, on the ground of the non-fulfillment by his son of the conditions of the donation. He died six days after the signing of the first decree by which that donation was revoked.

What became of the twice remanded case? We are not informed;

but, on the 24th of April 1874—defendants, through their agent, ratified a compromise previously made by the executors of their grandfather's will, with the creditors of John Perkins junior. That compromise is not in the record. In and by the same act, defendants accepted from said executors, "all and singular the property of the deceased's succession, consisting of what is known as the Somerset estate, together with all and singular the personal property belonging to said estate and thereto attached, as well as all other property and effects of said succession under the administration and control of the said executors." When this delivery was made and accepted, Somerset had been and stood inventoried as belonging to the succession of John Perkins senior, since more than seven years; and this delivery was made and accepted on the express condition that defendants—as heirs and universal legatees of said deceased—would pay all the debts of the succession and discharge the legacies " in so far as the same are legal and binding on the property of said estate."

On the 20th of May 1874—less than a month after they had been placed in possession of Somerset, defendants mortgaged it to Mrs. Chaplain, to secure a loan of $28,000, and—in the act passed to that effect —mention is made that said property is encumbered with certain legacies well known to the mortgagee." The legacies thus referred to are certainly those made by John Perkins senior. If defendants acquired their title under the donation of 1857, how explain their assumption of debts and charges not imposed by that donation? How explain that they did not themselves collect, and allowed the executors of the now assailed will to receive and dispose of the revenues of Somerset, and sanctioned—not only the receipt, but the disposition made of those revenues—by their approval of the account rendered at their own demand by said executors?

It is contended, with a great deal of force and ingenuity that Somerset did not belong to the succession of John Perkins senior—that said succession had no real property in Louisiana, (and—if it did now own Somerset—this is true)—and that, in accepting from the executors the surrender of that estate, defendants merely took that which— since 1869—had been their property, under the dation in payment from John Perkins jr to them. If so, we are at a loss to understand why they incurred the trouble and expense of appointing an agent to settle— in this State—a succession which owned nothing in this State. That supposition can not be reconciled with and is repelled by every word of defendant's mandate to Farrar.

On March 25th, 1874, these defendants went before a notary in Paris, and appointed Judge E. D. Farrar their agent and attorney in fact, for the reasons and purposes set forth by them as follows:

"Whereas, the said Nora M. Perkins, Annie William Perkins and Blanche Z. Perkins are the universal heirs and legatees of John Perkins, Sr., deceased, whose estate has been opened and is now being administered in the State of Louisiana by Abner N. Ogden and Josiah Stansbrough, executors of the last will of said John Perkins, deceased;

And, whereas, it is desirable that said administration should be closed and terminated, and the *property of said estate turned over and surrendered to said heirs;*

And, whereas, there are debts due by and outstanding against said estate, and also legacies in favor of divers and sundry persons, and among them to Ellen M. Perkins, which legacies are, in whole or in part, unpaid;

And, whereas, certain obligations have been assumed by these appearers for the payment of certain sums to divers creditors of John Perkins, Jr., as shown and evidenced by an act of compromise with said creditors, of date in the year 1871;

And, whereas, in order to the prompt and speedy settlement of said debts and legacies, it may become necessary to dispose of portions of *the real estate* of said succession, and enter into compromises and transactions with said creditors and legatees;

Now, therefore, we do by these presents confer upon our said agent, Edgar D. Farrar, full and plenary power for the purpose herein above set forth, and authorize him particularly and especially,

1st. To institute and prosecute, in our names, all suits, etc.        *

2d. To represent us, judicially or otherwise, in the final settlements of the accounts of said executors, and to compromise and compound with them, to grant them acquittances and discharges from their trusts in our names and behalfs, and to *receive and receipt for the property of said estate.*

3d. To acknowledge and bind us for the payment of any and all legacies and debts due by us or from the estate of said John Perkins, deceased, etc.        *        *        *

4th. To sell or give in payment unto said legatees or creditors, or to sell to other persons such portions *of the real estate aforesaid,* as he may deem proper, etc.        *        *        *

5th. To lease out any and all lands, etc.        *        *        *

6th. To borrow money and contract debts, etc., and to execute mortgages to secure same.

What real estate of said succession, did defendants themselves authorize their agent to receive from the executors and to dispose of, in order to effect the prompt and speedy settlement of the debts and legacies alluded to in their procuration? It was undoubtedly the Somerset estate, or the whole of that power of attorney is meaningless.

46

We have referred to, but did not consider the evidence which might have been adduced of the institution of a suit to revoke the donation of 1857—but, taking the facts as they were elicited on the trial —we must consider and decide whether a suit commenced by a donor, for the revocation of a donation, on account of the non-performance of the conditions therein imposed, can be prosecuted—after his death—by the executor to whom he has given the seizin of all the estate of his succession.    After answer filed, actions do not abate by the death of any of the parties, and the executor is bound to administer on all the property of a succession which is expressly declared in the will to belong to the testator, even on property claimed under an adverse title, and may maintain an action to annul a donation *inter vivos* made by the testator. C. P. 21; 6 L. R. 99; 7 L. R. 32.

In this instance, have the executors done so?  Have they continued the suit which—in his testament—the deceased declared that he has brought and which is alluded to in Judge Ogden's letter to Eskridge? If they have, what has been the result?  Has the revocation been pronounced?  This important fact is commented upon by plaintiffs and defendants, asserted by the former, denied by the latter, but neither fully established by the first, nor completely contradicted by the others, and we are left in presence of the deceased's declaration that Somerset has reverted to him, and of the acceptance by and delivery to defendants of the legacy which the will contains in their favor.

Have they not—by that acceptance—by their declarations and their acts—assumed the quality of universal legatees or legatees under an universal title of John Perkins senior?  If so, they are bound for the debts and charges of the succession, and—saving the case of reduction, for the payment of the particular legacies.

C. C. 1611 (1693) 1614 (1606); 2 R. R. 382.

It is not alleged that their acceptance was the consequence of any error of fact—of any fraud practiced, or violence exercised against them, and they can not now dispute its validity.   They have—in judicial proceedings and in an authentic act—assumed the quality of heirs and universal legatees, and their acceptance is the simple and express one referred to in the 988th article of the Revised Code.

Defendants' counsel rely on article 1890 of said Code, which provides: " that a person may also, in his own name, make some advantage for a third person the condition or consideration of a commutative contract, or onerous donation; and if such third person consents to avail himself of the advantage stipulated in his favor, the contract can not be revoked."

Applying that article to this case, they say: the stipulation made in favor of defendants in the donation of 1857, was accepted by their tutrix, and their interest can not be affected by any judgment of revoca-

tion that may have been rendered in a suit to which they were not parties.

If that stipulation stood alone : were it the only charge imposed upon the donee, that argument would present an important question; but the first, the paramount obligation of the donation from the father to the son, was that—from the first of January 1858—the son would pay to his father, during the natural life of the latter, an annuity of $15,000, and it is admitted that—at the death of the donor—of the ten instalments of that annuity which had then matured, not one had been paid. The donee was, or it appears was then owing the donor one hundred and fifty thousand dollars; and—inasmuch as the conditions of the donation had not been complied with, he was not the incommutable owner of the property comprised in the donation.

Demolombe, vol. 20, p. 573, number 610.

He—nevertheless—before he had himself acquired an indefeasible title to the property which he held under a conditional donation, transferred it to defendants who had thereon but an eventual right, one which depended on the execution by the donee of his principal obligation in that quality, which was to pay to his father an annuity of $15,000. When was that transfer made ? After the institution of the suit in revocation, and—it may be—after those who opposed it had expressly or tacitly assented to that revocation, after a revocation which—we presume—must have been contested by others than the defendants—as, otherwise—the evidence of their contestation and of its results would have been introduced on the trial.

Demolombe—vol 20, p. 534 and 535—said: "Les charges, dans une donation, n'étant pas la cause principale de l'opération, mais ne formant que des clauses accessoires, on aurait pu douter si leur inexécution pouvait ouvrir, au profit du donateur, une action en révocation, et c'est ce doute que le législateur a résolu, etc."—and, at page 562—" Que le donateur ne puisse pas demander directement l'exécution des charges, qui n'ont pas été stipulées dans son intérêt, cela se conçoit; mais c'est là précisément un motif pour qu'il puisse demander la révocation pour cause d'inexécution de ces charges: aussi le texte absolu des articles 953 et 954 du C. N. lui accorde-t-il ce droit, pour tous les cas, sans distinction."

The same author indicates the difference between the revocation and dissolution of an act of donation.

" D'une part, on a dit qu'autre chose est *la résolution* de la donation, autre chose la *révocation !* Le donateur, qui stipule une condition résolutoire—comme, par exemple—le droit de retour, ne révoque point par là sa libéralité: il en limite seulement l'étendue par une clause concomitante et constitutive de sa libéralité elle même; et—dans ce cas—la donation,

après qu'elle a été résolue par l'évènement de la condition, n'en a pas moins reçu toute la plénitude d'exécution, dont elle était susceptible, dans la mesure où elle avait été faite. Très différente est la donation révoquée, qui, loin de finir conformément à la loi de sa constitution, finit, au contraire—par une déchéance qui implique, en quelque sorte, l'idée d'un effet manqué.

Demolombe, C. N. vol. 20, page 521, Coin-Delisle, art. 953, No. 2.

The acceptance by defendants' tutrix—not of a donation made to them, and in an act passed between them and their ancestor—but of a charge imposed in their behalf, in an act to which they were not parties— did not close the door against their ancestor's action for the revocation of the donation, on account of the non-performance of its conditions. R. C. C. 1559, number 3.

What is the position in which the defendants have placed themselves, in regard to the succession of John Perkins senior? In their procuration of the 25th of March 1874, to Edgar D. Farrar, they represent themselves as " the universal heirs and legatees of said deceased." In their petition of the 23d of April, alleging to be the beneficiary heirs and universal legatees of their grandfather, they asked of his executors a final account of their administration of his succession, and the delivery of the property thereto belonging. The account demanded was filed and approved—and, by a notarial act of the 24th of April—they, as heirs and universal legatees, took possession of all that composed said succession in Louisiana, and that was the Somerset estate, discharged the executors and bound themselves to pay the debts and legacies for which it was liable.

Whether they had or have on or in Somerset, rights derived by them, through their father and from their grandmother: whether they did acquire, by the dation in payment of the 11th of August 1869, an absolute title to that estate—the fact is there, staring us in the face, that—by the act of the 24th of April, they took—not under the dation in payment, but under the will, and—as against that act, its recitals and stipulations, they plead neither error nor fraud—Can we relieve them from the legal effects of their own admissions, from the legal effects of their uncontradicted declaration that they have claimed, been allowed and taken possession of the whole of the succession of John Perkins senior, including Somerset—from the legal effects of their absolute promise to pay the debts and legacies ?    We can not: but, to what extent are defendants liable for those legacies ?

The Civil Code fixes the extent of their liability; it provides:

Art. 1633—The heirs of the testator, or other debtors of the legacy, shall be personally bound to discharge it—each in proportion to the part that falls to him in the succession.

Art. 1465—*The heir, or universal successor, is not bound for the lega-cies, except to the amount of the value of the effects of the succession,* and he can therefore free himself from them by abandoning to the lega-tees what remains of the succession after the payment of the debts.

Art. 1466—If it be the forced heir who makes the abandonment to the legatees, he has the right to reserve to himself, from the effects of the succession, the legitimate portion secured to him by law, and shall deliver up the balance to the legatees.

In his commentaries on article 1017 of the Napoleon Code, of which the 1633d article of ours is a literal copy, Marcadé said : "Puisque les legs ne peuvent se prendre que sur le disponible, et que les successeurs généraux ne les doivent que dans les limites du disponible qu'ils de-tiennent, comment voulez vous que l'héritier les donne encore après que la succession entière est épuisée ? La qualité d'héritier pur et simple est ici insignifiante, et celui qui en est revêtu se trouve—quant à l'acquitte-ment des legs—sur la même ligne que l'héritier bénéficiaire et les léga-taires universels et à titre universel. La distinction entre l'héritier pur et simple et les autres successeurs généraux n'existe que pour les dettes."

It was the evident intention of John Perkins senior to leave to the children of his deceased son William the largest share of his considera-ble fortune, but he had not foreseen the events which occurred after his death, which condemned the largest of our estates to a prolonged sterility, reduced their value and production—and converted once productive lands into real burdens. Trusting to the experience of the past, impressed with the recollection of the revenues derived from the culti-vation of Somerset, he directed that the payment of most of his partic-ular legacies should be made out of its future revenues.

Defendants' counsel urge that the legacies to plaintiffs can not be paid otherwise than as thus directed: that they are not payable out of the property generally, nor by a sale of any portion of the same. This argument is based on a clause in the will, in which the testator expresses "the desire that his property should be kept together *by his executors* for the benefit of his grandchildren and the payment of the legacies." The succession of John Perkins senior has been opened for upwards of eleven years: his universal legatees have received the property which composed it since four years, and the inevitable effect of the defendants' construction of that clause of the will, would be to postpone indefinitely the payment of the particular legacies. The instructions from the deceased *to his executors* might have been enforced during *their* admin-istration and while they had the seizin of the succession; but they were not intended to suspend—at the will of his universal legatees—the exe-cution of the other clauses of his testament. His most earnest wish

Eskridge vs. Farrar.

was to prevent the morcelling of Somerset, and yet, as to that estate, he advises that it be kept undivided as long as the law will permit.

"Particular legacies must be discharged in preference to all others, even though they exhaust the whole of the succession, or all that remains after the payment of the debts and the contributions for the legitimate portion, in case there are forced heirs.

R. C. C. 1634.

"In default of funds sufficient to discharge the·debts and legacies of sums of money, the executors shall cause themselves to·be authorized by the Court to sell the movables, and if they are insufficient, the immovables, to a sufficient amount to satisfy the debts and legacies.

R. C. C. 1668.

Was Somerset the separate property of John Perkins senior, or did it or any part of it belong to the community which existed between him and his deceased wife? If it was common property, and if, as such, any part of it passed to defendants' father or to them, they might—by proper steps—protect any title so acquired by them against the enforcement of plaintiffs' rights.

They are bound for the legacies only to the amount of the value of the effects of the succession, and they can free themselves from them by abandoning to the legatees after the payment of the debts and the reserve of their *legitime*, whatever may then remain of what they received from their ancestor's succession.

R. C. C. 1465—1466.

The prescription of one year urged by defendants is not applicable to plaintiffs' demand, and—considering the acknowledgments and promises made by the former in the act of the 24th of April 1874—that of ten years, if applicable, has been interrupted.

The prescription of five years opposed by plaintiffs to defendants' informal demand for a reduction of the legacies which they seek to recover, runs against minors only from the date of their majority. At the death of their ancestor, the universal legatees were minors—that is shown, and we are not informed when they became of age.

R. C. C. 3542 (3507).

This fact, and the fact that the evidence is too incomplete to justify the fixing of any reduction to which the defendants may be entitled, compel us to remand this cause to the lower court for a new trial—and, in so doing—we do not limit the scope of that trial.

· It is, therefore, ordered, adjudged and decreed that the judgment appealed from is avoided and reversed, and this case remanded below, to be proceeded in according to the views herein expressed and according to law: the costs of the appeal to be paid by plaintiffs.

SPENCER, J. recused.